In case of this morning, Gregg v. Superintendent Rockview, et al, number 13-4496, Ms. Swan and Mr. Iannamorelli. Iannamorelli, sorry. Good morning. May it please the court, my name is Suzanne Swan and I represent the appellate Daryl Gregg. How recently did you get called on to do this oral argument rather than Mr. Rubenstein? About two weeks ago, Your Honor. With your court's permission. Does this mean you say thank you very little or thank you very much? Well, I do appreciate the opportunity. This is my first appearance in federal court. I'm glad to have you. I would like to reserve two minutes with this court's permission for rebuttal. Granted. Thank you. The Supreme Court has said that an alibi defense is among the most compelling defenses available to a criminal defendant. It is Mr. Gregg's position that he was denied his Sixth Amendment right to the effective assistance of counsel due to his attorney's failure to subpoena a known alibi witness and to investigate a second alibi witness whose identity was easily discovered. Yeah, that's what the certificate of appealability talked about. If the counsel had subpoenaed Mr. Jones, we still have been obligated to investigate Mrs. Jarrell. Yes, Your Honor. It would not have been cumulative evidence. In fact, what would have happened is Mr. Jones would have testified that he and Mrs. Fitzgerald and Mr. Gregg were present at the time he was there playing video games. The jury would have wondered, well, where's Mrs. Fitzgerald? Also, it's not cumulative because the question, it was, where was Mr. Jones? And there is case law that states that it defines what cumulative evidence is and that, just have a moment, I'm just looking at that question. The impact, according to Black's Law Dictionary, cumulative evidence supports a fact established by existing evidence. Well, where Mr. Gregg was was the issue in the case. It wasn't established. And as I said, the jury would be expecting both witnesses to be present. As it happened, Mr. Gregg testified, got up and testified that he was with Mr. Jones and Mrs. Fitzgerald at the time of the incident. Well, the prosecutor certainly jumped on that in closing argument and said so, said to the jury, so where's Mr. Jones? And that had to have a very detrimental impact on the jury's consideration. Of course, of course, we're not reviewing this matter de novo. No. So would you explain how this falls within our very narrow scope of review under the Anti-Terrorism and Effective Death Penalty Act? It's a pretty high hill. It's a very high, yes, I did notice that. It's a very high standard. That one's hard not to notice. Yeah. However, the standard is that the state court's decision was involved in unreasonable application of clearly established federal law, and we're saying that federal law is strickland. As far as the facts, we believe that the record does not support the state appellate court's finding and that as a result we can show clearly erroneous, incorrect, that his factual determinations were incorrect by clear and convincing evidence. One of the questions I have in a context like this when it's an ineffective assistance of counsel claim is the state court determination that counsel was not ineffective in this particular instance. How do we look at that as a finding of fact that you have to show was clearly erroneous? Well, it's interwoven. His legal determination was interwoven with factual determinations, which we argue were not supported by the record, and therefore they were objectively unreasonable. For instance, he said that, number one, that he made a finding that counsel was not ineffective because the witnesses were not willing to testify. The record does not support that factual finding, which in turn supports his legal conclusion. Well, part of the trial, as I recollect, part of the trial court's conclusion that they were not willing to testify was a credibility determination. That was the second factual determination that he made. He basically stood in place of the jury and made a credibility determination as to whether they were credible alibi witnesses. Was that inappropriate? Yes. Well, the Supreme Court has stated in the United States v. Schaeffer the jury is the lie detector. It was for the jury to determine the weight and credibility of the alibi witness testimony. There was nothing in the record to show conclusively that Mr. Jones and Ms. Fitzgerald were lying. In fact, Trooper Petroski confirmed that they came in, they accompanied Mr. Gregg, when he turned himself in and said, hey, he was with us. But isn't a PCRA court entitled to go back and ask some questions? I mean, that's what we're looking at, and, you know, obviously we know what happened there. The PCRA judge said they're not credible. Well, they were no more or less. It's not about credibility at that particular stage. It's not his job to determine that. It would have been basically Mr. Jones and Ms. Fitzgerald were against the Commonwealth sole witness, main witness Darren Mackey, whose bias and prior inconsistent statements were certainly presented to the jury. And it's all about the jury then saying, okay, who do we believe? Well, I mean, if we go with what the PCRA judge found, that Ms. Fitzgerald and Ms. Jones were not credible witnesses, how can there be prejudice here? Is there real prejudice from not calling witnesses that are not going to be credible? Well, I would say that it was objectively unreasonable for the trial judge to make that finding, first of all. And second of all, it's prejudice because his performance in Nott, he had no idea whether these witnesses were credible or not. The trial attorney had no tactical reason for his omissions. If he had called them, we could argue that the outcome might have been different, that they would have gone and testified on behalf of Mr. Gregg to support his alibi, given substance and credibility to his testimony, certainly. The trial counsel testified that Jones had assured him that he would be available to testify. That he would, did you say? Yes. Yes. He was a 17 or 18-year-old kid. He called him, the trial counsel called him on the day, the first day of trial, and said, hey, can you come down and testify? That's totally unreasonable. That's not professional representation. Was there any effort to locate him to serve a subpoena on him? No. The trial counsel never even thought about issuing a subpoena. He gave no reason for it. Now, there are certain circumstances where an attorney might not want to do that. It might have a chilling effect. But he did not cite to that as a reason for not issuing a subpoena. I think Judge Anaske just asked, could he? Did he know an address where he could actually subpoena the trial? Yes. Yes, he had actually spoken with him a month before the first trial date. He finally spoke, got on the phone with him and did talk to him, got an address, set up an appointment. He doesn't show up. At that point, the alarm bells should have said, hey, you're going to need to push him a little bit to get in here. Even prosecution witnesses don't go knocking on the prosecutor's door and say to do their civic duty. They have to go out and investigate, interview, and subpoena, even when these witnesses are supposed to testify on behalf of someone they know who was harmed. They have trouble getting victims to come in and testify. And certainly defense counsel should go with it, be abide by that minimum standard of investigating and interviewing and making sure by subpoena or at least advance notice that that witness, that crucial witness, is going to appear. Can I ask you why Judge Solomon, the PCRA judge's determinations that Jones and Ms. Fitzgerald were not credible? How is that unreasonable in light of the record? Well, because there was nothing in the record to say that they were lying, that was definitely saying that they couldn't be believed. You had the trooper confirming that they had appeared and made a statement on behalf of Mr. Gregg, on Mr. Gregg's behalf. Now they said there was some issue as to they couldn't say why they remembered the specific date of the incident in question, other than they heard about the shooting and then they heard the police were looking for Mr. Gregg. Well, that all happened shortly after the shooting. So I'm sure, you know, within a couple weeks, they're saying, well, wait, he was with us that day. You know, he's watching video games. And, again, it's for the jury to decide. Certainly the DA would bring that all out on cross and the jury would say, well, you know, we're not so sure we believe them. Or it might not be that important. They might say, well, yeah, because it happened right after the shooting. That's why they remember it, that they remember them looking for Mr. Gregg and, you know, they heard about it immediately after the crime occurred. Who testified at the evidentiary hearing? Mr. Jones and Ms. Fitzgerald both testified at the evidentiary hearing that they were willing to testify on behalf of Mr. Gregg at trial. Also Mr. Gregg testified and Trooper Petroski and I believe the defense attorney. The victim testified too. Did the victim testify as well? Yes, I believe the victim testified as well. He supported the defense case as to why the prosecution case was so weak. He said that the alleged accomplice took the police to these guns that he said were used. The alleged accomplice also named two other people at first. He said two other people were involved in this and then he wouldn't give them the names so they wouldn't make a deal with them until he gave them a real name. So he gave them Mr. Gregg's name and another gentleman's name and he led them to these guns and these guns did not, the victim said that's not the gun that was being pointed at me, that's a long-barreled revolver and it was an automatic, I know the guy was holding an automatic weapon, those aren't the guns. So there was a problem there. The weapons couldn't be tied forensically to the crime. Couldn't be tied or there was no effort to tie them to the crime? I think it was both, yeah. They said the bullets and buckshot were still in the victim. However, one did go through his hand and had it go somewhere. I don't think they made much of an effort to try to find that bullet, try to match it up. There were no fingerprints taken. There was nothing to tie the weapons to Mr. Gregg or any of the co-defendants. And as an aside, the same accomplice was brought to testify against yet the second co-conspirator. On the stand, he recanted everything and he ended up being found not guilty. He basically took back everything, his accusation against that co-conspirator and the jury found. This was Stefan Fitzgerald? Yes. Now, is he in relation to Wheezy Fitzgerald? I couldn't find anything that he, as far as I could read, I didn't see any association. Has Mr. Mackey ever recanted as to Mr. Gregg? It's not clear. I don't think so. I think he was in his holding cell with Mr. Fitzgerald and that's when he told him. I think he told him as to both of them. You know, I made up both your names. I made up this whole version because the police said that they would drop the attempted homicide and that they would try him. He's a juvenile instead of an adult. How old was Mackey? He was 17, wasn't he? He must have been 17. How old was Mr. Gregg? I'm not sure. He was 19, wasn't he? He must have been old enough to not even be a question. I thought he was 19. He had adjudications, but I don't know if he had just turned as an adult. Okay. Mr. Harper testified at the PCRA hearing that there was no animosity between his family and Mr. Gregg. Correct. Yes. And, again, you're correct. Darren Mackey did say that that's what Mr. Gregg, the reason why Mr. Gregg. He wanted to spank him. Yeah. Yeah. And here's the victim saying, I don't know what you're talking about. And the victim was convinced that it was not Mr. Gregg, that he physically, when he had a chance to get close to him, he realized that's not the guy I saw in the hallway. So he actually testified for the defense at the PCRA hearing. Thank you very much. We'll get you back. Thank you very much. Mr. Iannamorelli? May it please the Court, Anthony? Iannamorelli. This is my first time arguing in front of the Court. I'm actually in Philadelphia, so just what an honor. Welcome to both of you. Thank you. Thank you very much. This is a case where the evidence against Mr. Gregg turns out to be pretty weak. Let's just start. No forensic evidence whatsoever. Mr. Mackey has changed his story a number of times. When he testifies against Mr. Gregg, he gets a significant benefit by being tried as a juvenile or being, in effect, sentenced as a juvenile. He then later recants that during the Stefan v. Gerald trial. Mr. Harper thinks it probably was not Mr. Gregg who shot him. Certainly couldn't identify him. Not at all, Your Honor. He had a face mask. I'm sorry, I didn't mean to interrupt. No, go ahead. I think his, and by the way, my recollection, I was actually an intern at the office when this PCRA actually went on. But his testimony was, though, I mean, wasn't great on not the eye. I wouldn't have taken his testimony at trial as an identification. You don't want to go to trial with that. He's saying, I was able to see just a little bit because they had face masks on, and of the tiny strips of skin that I could see, it was a little lighter than he is. It was a lighter skin tone, maybe not as built. From a door that was, I believe, getting slammed shut because bullets were flying through it. If I came with that evidence of that being him, first of all, I don't even think I'd make it past a prelim with that identification testimony. And to the idea of a prelim, and I think this is an important thing to think about as we look at this entire case, is what defense counsel would like to turn, if this argument is accepted, it turns the PCRA statute into basically a prima facie hearing, that a PCRA judge can't make a determination of credibility at an evidentiary hearing if you bring in anybody who says, I would have been an alibi witness. I would have testified if he subpoenaed me at trial to be there. It could be a cellmate in Rockview says, oh, yeah, yeah, I was in that area at that time, and you were with me playing video games in Philadelphia at that time. It turns it into there's no credibility testimony. So you just put on anybody. Well, these are two people that purportedly were with Mr. Gregg the night of the murder. And one of the things the judge focused on, he said there was a tension in their testimony at the PCRA hearing, saying Mr. Gregg said that he was there until 1.30, and that the other said that he was at their place with them between 10 and 10.30. In fact, what Gregg testified to is that he was there between 10 and 10.30. So you begin to wonder if the attempt to cherry-pick evidence to show a lack of credibility, when that evidence isn't even cherry-picked correctly. I don't think it's a determination, though, of just their testimony that the PCRA court is looking at, though. It's a credibility determination on their willingness. And Mr. Jones, I would say, was not willing to testify at that time. A car is waiting at his house. But he could have been subpoenaed. We're talking about ineffective assistance of counsel. We are. And I think in this case, though, to say that a subpoena is the magic piece of paper that brings him in on that day, I don't think then what we're willing to say then is you have to subpoena the person. So are we now saying if you subpoena, which, you know, you get a constable for, you know, in Fayette County, you could do that for about $20, especially because it's right by the courthouse, to stamp something on his last note address, he has a subpoena hidden, Judge. I'm asking for a bench warrant on what? The trial to be suspended until we find Mr. Fitzgerald? No, instead, this attorney made efforts to locate him. He knew where he was at. At the very end. I mean, if you were Mr. Gregg, and your counsel doesn't go after Mr. Try to find Mr. Jones, you know, two, three months ahead of time. You've got this trial coming up initially in October, which was later put off to November. Doesn't try to find out who Ms. Fitzgerald even is. Never investigates her. And you wait until the day of trial. Or you call maybe the Friday before trials start on Monday. And then you wait until the very day of trial, and he doesn't show up. You send somebody out there, but you're not even sure what the person is going to say. You haven't interviewed him. You haven't done anything. When you know that this is critical because the evidence that's going to be put against your client is that of, essentially, of Mr. Mackey because they have no forensic evidence. You know, wouldn't you feel like maybe I'm not getting a fair deal here? If I was Mr. Gregg, I would be looking at Levi Jones and saying, you know, what are you doing? My attorney called you on Friday and says, hey, trials start Monday. He said, I'm good to go. If you were Mr. Gregg, wouldn't you want him to have called him months ahead of time? You know, Judge, in a small county, we're calling people a lot, and we don't have a lot of investigators. I think it's, especially with the transient population, to pin them down and say that's right. Well, is Jones transient? I'm not sure if he's transient or not. I'm saying that if you have these cases, you've got to bank on it. But you talked about the credibility. Yes. The Sixth Circuit, in a case called Avery in 2008, has said that the evaluation of the credibility of alibi witnesses is exactly the task to be performed by a rational jury. So maybe a judge can say that I don't believe necessarily at the PICRA hearing that you would have shown up. Exactly. But that's different from evaluating the credibility of what they would have testified to had they been at trial. But I don't believe it goes to prejudice, Your Honor. It doesn't go to prejudice because? I don't believe that would go to prejudice if what these victims testify to, even if assumed is true, does not benefit Mr. Gregg. And really, I think, too, we can only look at what Levi Jones said. He said he's there. There's no exact timeline. Does his testimony help when he says, I don't really remember the date? And that's the big key here. Times 1030, playing video games, but he could have been playing video games with him the day before or the day after this. He says, oh, yeah, that date on the news I heard. If he came in and said, I remember that date exactly, it was the day of my little brother's birthday, and he played video games right after we cut the cake and he was there all night, and that's the date we're talking about, and I remember that specifically. But he didn't say that. He said, oh, I kind of remember that day. He was playing video games with me. He didn't say this was the one time that he's ever played video games with me in his life. That's the determination of prejudice that a PCRA court is left to as well, which is different than the alibi witness, though. I mean, I think that's the part. What is the Pennsylvania law with regard to not calling when counsel is ineffective for not calling a particular witness? Not calling the alibi witness itself, Your Honor. I quote it in my brief. I'm citing Commonwealth v. Woods where it says, in order to establish an effective assistance for failing to call a witness, the appellate must establish, one, that the witness existed and was available, two, that counsel was informed. Let me stop you on one because in Grant, and it's also the same as in Commonwealth v. Clark. It looks like there's five provisions. In Grant v. Lockett, which is a case from our court last year, I think Judge Manaske was on the panel, we noted that, quote, we are troubled by the Pennsylvania Supreme Court's requirement that the petitioner show that the witnesses at issue were ready, willing, and able to testify at the trial. Absent extenuating circumstances such as the existence of a privilege or the witness's incapacity or death, whether a witness is ready and willing to testify is irrelevant since defense counsel can compel testimony through a trial subpoena. So at the very least, maybe this is the case to tackle head-on rather than in a footnote, whether federal law will accept that the witness be unavailable. In that case, Your Honor, to just say then that the subpoena must be used, I mean, we need to look at the pragmatic concerns of just using a subpoena. What are the requirements? Is it personal service of a subpoena? Again, let's flip-flop this requirement, and that's what I was thinking of as I looked at this case, and you always put yourself in trial counsel. Let's say trial counsel, again, pays that constable months before trial. He's looking at them. Hey, I can't find him, but I got his last note. He posts it on his door. Counsel makes no other efforts other than that, but we do have the subpoena. He goes the day of trial. The Commonwealth has rested its case in chief and says, Your Honor, I have a constable who has tried to find this witness. I've posted the subpoena, or let's say he actually personally serves him. I'm now asking for a bench warrant for his immediate apprehension. We have to go out and find him. I guess then you tell the Pennsylvania State Police or the City of Uniontown, because it has a police department, go find this guy. It's a police department. Our sheriffs can't go out and get him. Do you then suspend the trial for the months it takes to put Mr. Jones in jail? When you finally pick him up. Now you've got a guy coming in who's been sitting in jail for a bit of time, and he's going to come on and testify. It does have to speak pragmatically to what counsel is doing, and what counsel is doing in this case, though, is, of course, he's called the guy. Sure, I'm going to be there. He has no problems with it. Well, it's a little more than that. You're right. I'm sorry, Your Honor. I didn't mean to jump over those issues. No, because, I mean, he was least unnoticed. Hey, this guy might be a problem. I mean, we made time to meet. The guy didn't show. You know, it sounded like a guy, I think, as your adversary noted, knocking on the door saying, hey, I can't wait to come and testify to help out. This is a guy who's shown a little bit of, I don't know, resistance, maybe too hard, but at least being not really reliable. I mean, yeah, he didn't show up for an appointment, but he talked to him on the phone, though. I mean, he did say, yeah, I'll be there. But then it's no one called me. Does counsel know what he was going to testify to? I don't believe that's in the record. I believe we just have to assume that he said, hey, I'll come and testify as to what my client testified, what his client said he would testify to. And there is some onerous on Mr. Gregg to inform counsel. I mean, investigation aside, in a case like this. Well, he did inform counsel about Jones. Yes. And he did give the name of Ms. Gerald. Counsel could have followed up. Counsel didn't even investigate Ms. Gerald. I think the investigation at that point, though, would be to ask the witness, who are you talking about when you talk about Wheezy? How about asking his client? That's what I'm, I'm sorry, I said Mr. Jones, Mr. Gregg. Mr. Gregg gave him. Mr. Gregg, but Mr. Gregg didn't know Wheezy's last name. I thought that's what the record showed. I think the record, yeah, he just gave her a nickname, but in that, in the record. We should have asked Mr. Jones who's Wheezy, because they were together. Wheezy, Jones, and Gregg. If he did think, I don't know if that question was asked. What time did the shooting take place? I'm not exactly sure on the record. Without, I couldn't speak. Whatever is on the record, I apologize. Was it, I mean, Gregg testified that he was with Fitzgerald around 10 to 10.30, correct? I believe so. I believe that. I would defer to the court who, you know, has that. I don't remember. I'm asking what time. I'm not sure of that on the actual record, because, again, I'm looking at it as, not time, but date. I mean, he could have the, again, he could. Well, I mean, it happens, sometimes it happens at day or night. So, I mean, did this happen? I believe it happened at night. Shortly after, shortly after 9.30 p.m. That would be the testimony then, yes. But what we don't have is Levi Jones coming in, being a true alibi witness, and saying on that date and time. He's just saying a time that they were playing video games together. You have to be an alibi witness. I mean, I've had alibi witnesses come in and, of course, they always tell the time. You have to put a date here, too. Look, it's real simple. He's trying, Mr. Gregg's trying to place himself at the time of the shooting at a different place and have somebody say that he was with him at that different place at that time. Yes. That's an alibi witness. It is. If you have the alibi witness who says he was with me on that date and that time. I think those are kind of the requirements of an alibi witness, though, that it was actually that date as well. And I don't think Levi Jones, his testimony vacillating, I don't think he testified right to that, actually, at the PCRA hearing. And I think there is that binding. You are bound by some facts in that that they look at and say this wasn't a credible guy as to his willingness. And even if then you look at the prejudice end, which is a consideration, I believe, under the PCRA Act, you look and say he couldn't even nail down the date that we're talking about. He said it might have been the date on the news. Was it reasonable for trial counsel to make the attempt to inform, no attempt, no attempt, to inform Jones about the date of trial until the morning of trial? Given the system we have in Fayette County with the cattle call, we don't have dates certain. We have a criminal trial list in the first week of every month. Those trials get called for trial. And we know what courtroom we're in and everything like that. There might be cases that have to go in before it. Truthfully, we pick somebody up on a bench for it the day before. I think, yes, it is, because actually you are getting somebody who you're getting them right then. You're getting them saying, hey, we're going to pick you up tomorrow. Where are you at? Well, I'm right here. Okay, Carl, be there. I think that's actually very effective rather than saying, hey, two months out, we'll get you. And I understand you can continually keep tabs on him, but I'm saying it's not ineffective to call somebody the day before, have their agreement that they are going to be there, send out a card for them. So there's, you know, again, you have a little bit he didn't show up at a hearing. But you want to know what your witness is going to testify to. And you're saying that, in effect, if you've got a system in a county where there is a cattle call with regard to a trial, it doesn't seem to comport with what we think about as a fair trial, does it? I think it does. We do have a call to criminal trial list. We do know that cases are – it's not a surprise. I realize that's not the issue before us. But, no, I don't – if you're asking me if I'd like dates certain at times, yes, of course. I think that does help. But we have a call to criminal trial list. Everybody knows that case is going to trial. We don't know exactly if it's going to be Monday or Tuesday. But that doesn't really speak to it as much. It wouldn't be next month or anything. But we're talking about a trial counsel who calls and says, hey, are you going to be there? Yeah, great. I think it's better to only have one or two days because you're going to do that anyways. You know, I have to – I'm sorry. I've run out of time. Go ahead. Finish your sentence. But that short amount of time doesn't go to ineffective assistance. It actually goes to being able to say, okay, we're going to send out – we'll see you in two days. It's fresh in that witness's memory. You're going to be able to go get with them. Or, in this case, what actually happened, it seems like you just had an unwilling witness who might have been okay with a few phone calls, but wasn't going to come anyways, and it might not have come even with a subpoena. And I think that's a guessing game that his actions actually show circumstantially he wasn't going to show up. And even if he did, we have that prejudice issue as well. I thank you very much. Okay. Thank you. Ms. Rahn. Your Honor, I just wanted to point out a couple of things. Mr. Gregg turned himself in in April, and the attorney didn't even talk to him until August. He didn't open the file until around August and September. That's when he saw his investigator's notes that there was this alibi, the two alibi witnesses. He clearly did not follow up and ask even Mr. Gregg, who's Wheezy? Because Mr. Gregg gets on the stand, and guess what he says? I was with Mr. Jones and Tachika Fitzgerald on that night. Lo and behold, there's the name. If counsel had just asked him, you know, where's this name coming from all of a sudden? He didn't do any kind of investigation, any interviewing. He had no idea what Mr. Jones or Ms. Fitzgerald would say. And as far as the exact day, this was two years later that they testified at the PCRA hearing. Remember that Mr. Jones and Ms. Fitzgerald accompanied Mr. Gregg within a month after the incident occurred and made a statement to the police telling them that that was that specific day and that specific time. That report was apparently misplaced by the police, however, according to Trooper Petroski. And he can't say, he can't confirm or deny whether Ms. Fitzgerald gave a statement or not. To me, these are red flags, and I think they should be considered. It's actually a word that was used by Mr. Gregg's trial counsel at the PCRA hearing. What's that? That there was a red flag with respect to Elyse Jones. Well, this Court's decision in United States v. Gray in 1989, the defense counsel told the defendant, go out and find these witnesses that you say will help you. He doesn't subpoena anybody. He doesn't do any follow-up. He makes the defendant go out, do all the work, ask the witnesses to show up. They don't show up. And like the defense counsel here, the attorney went ahead and presented the self-defense theory just through the defendant's testimony. This Court said, no, no, no. Their statement was, in sum, the attorney's decision was not based on tactical considerations but merely upon a lack of diligence. The counsel's complete abdication of the duty to investigate caused his performance to fall below the minimum standard of reasonable professional representation. That's the same right-on point to this case. Thank you very much. Thank you to both counsel for well-presented arguments, for your first arguments as they say in South Philly, you've done good. I would ask that a transcript be prepared of this oral argument, and if possible, Mr. Ayanna Morelli, if you would, would you mind picking that up? That's great. Thank you very much. Thanks to both of you. Hope to have you back.